UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DENISE D.,                              :
        Plaintiff,                  :
                                :
        v.                           :    C.A. No. 23-233-PAS
                                :
MARTIN O'MALLEY,                         :
Commissioner of Social Security,        :
        Defendant.                   :

**MEMORANDUM AND ORDER**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

      With a protective filing date of November 12, 2019, Plaintiff Denise D. ("Plaintiff"), then aged 49, applied for Supplemental Security Income ("SSI") pursuant to the Social Security Act (the "Act").[1]  Since late adolescence, Plaintiff has suffered from what is diagnosed in this record as ulcerative colitis ("UC"), but also as Crohn's disease and intestinal bowel disease ("IBD").  See Tr. 14, 18, 381.  The medical record reflects that Plaintiff's UC symptoms worsened in the five years preceding Plaintiff's SSI application.  Tr. 53.  Apart from a few attempts at working when she was much younger, which Plaintiff alleges failed because of workday interruptions due to her need to rush to the toilet, Tr. 765, Plaintiff has virtually no work history.  Tr. 13, 27; see Tr. 361 ("Out of work for 7 y[ea]rs [due to] calling in sick/being on toilet").  On application, Plaintiff alleged disability due to UC, clostridium difficile ("C-Diff."), colitis, gastritis, uterine fibroids, abscesses, body aches, insomnia, memory and concentration issues and fatigue.  Tr. 652.

      Now pending before the Court on consent pursuant to 28 U.S.C. § 636(c) is Plaintiff's motion for reversal of the determination of the Commissioner of Social Security

---

[1] Based on the protective filing date, the period in issue for this SSI case is from November 12, 2019, to the date of the administrative law judge's decision on May 18, 2022, approximately two and a half years.  See Tr. 28.

("Commissioner") denying her claim based on the decision of an administrative law judge

("ALJ").  ECF No. 12.  Pointing to the evidence of absenteeism, Plaintiff asks the Court to

remand for an award of benefits or alternatively for further proceedings.  The Commissioner has

filed a counter motion for an order affirming the ALJ's decision.  ECF No. 15.  Because the

ALJ's decision is tainted by error, the Appeals Council was egregiously mistaken when it

declined to consider the new and material evidence submitted to it, and the proof of absenteeism

is very strong, if not overwhelming, with no contrary evidence, the Court remands the case for an

award of benefits pursuant to Sacilowski v. Saul, 959 F.3d 431, 433, 440-41 (1st Cir. 2020).

## I.    **Procedural and Factual Background**

The evidence in this massive record (2,601 pages of material, most of which are medical

records) undisputedly establishes that, during the period in issue:

- Plaintiff was diagnosed with and treated for "complicated" UC, Tr. 1034, that "failed multiple treatment regimens," Tr. 1771, including on-and-off steroids and infusions of an array of medications, each of which were efficacious for a time but then failed or were stopped due to side effects;[2]

- When not stopped due to side effects or a decline in efficacy, Plaintiff's UC infusions were administered over a two-hour period in her gastroenterologist's office at intervals of every four weeks;[3]

- Plaintiff was treated for chronic C. Diff. with vancomycin, which medication was periodically continued even after C. Diff. was no longer detected;[4]

---

[2] E.g., Tr. 17-19, 1020, 1765-66; see Tr. 1034-38 (due to arthralgias, "constant dull joint pain that range from debilitating to irritating, . . . [Plaintiff and gastroenterologist Dr. Joel Spellun] may have to make tough decision about whether to come off the infliximab, the only medication the patient feels has helped her UC"); Tr. 1771 ("UC[] failed multiple treatment regimens").  The testifying medical expert, Dr. Joseph Gaeta, confirmed that Plaintiff's ulcerative colitis was objectively diagnosed by biopsies and had been treated with a variety of medications; "she's been on many drugs[, s]he does get relief and then she doesn't and its been changed."  Tr. 304-06.

[3] Tr. 17, 19-21; e.g., Tr. 1251, 1256.

[4] Tr. 22, 1505-07; see Tr. 1870 ("maintain prophylactic oral Vanco").

- Plaintiff's medications, especially the steroids and various medications infused to treat UC, caused significant side effects;[5]

- Plaintiff repeatedly suffered from and was treated for an array of infectious illnesses, including chronic sinus infections, urinary tract infections, ear infections, bronchitis, parasitic cryptosporidium and severe COVID-19-related pneumonia with pulmonary embolisms;[6]

- As noted by various treating providers, Plaintiff's symptoms include "diarrhea which is normally chronic due to UC," constipation, abdominal pain and bloating, "debilitating" joint pain, fatigue, high blood pressure, tachycardia, headaches, dizziness, confusion and anxiety about her condition;[7] and

- Plaintiff made frequent trips to hospital emergency departments (where she was occasionally briefly admitted) and clinics and was often found to need IV fluids to address dehydration.[8]

A few days before the start of the period in issue, on November 5, 2019, the treating gastroenterologist, Dr. Joel Spellun, reviewed Plaintiff's symptoms (including her reactions to medications, diarrhea and constipation), and recorded in his treating note: "Can't work with this. Out of work for 7 years – for calling in sick or being on the toilet." Tr. 1021. During the first fourteen months of the period in issue – November 12, 2019, through the end of 2020 – the record reflects the administration of steroids and infusions for UC (diagnosed as "Complicated," Tr. 1034) that sometimes caused extreme fatigue (Tr. 815), debilitating pain (Tr. 1034),[9] weight

---

[5] E.g., Tr. 133, 339-42, 1034-38, 1315, 1516, 1765, 2578. The ALJ acknowledges these side effects but minimizes them in the decision. Tr. 17-22.

[6] E.g., 20, 335, 1152, 1170, 1291, 1507, 1870. That Plaintiff was "sick frequently" was confirmed by the testifying medical expert, Dr. Gaeta. Tr. 316.

[7] E.g., Tr. 124, 157, 272, 314-15, 815-19, 1034, 1332, 1356, 1606, 1730, 1744, 1765, 2585.

[8] E.g., Tr. 21, 1546-51, 1606-14, 1652, 2021.

[9] In June 2020, one hospital physician noted that he could not determine whether the "arthralgias are either [due to] the infusion itself (which fits temporally) or a manifestation of her IBD progressing." Tr. 1038. He observed that she would face "a tough decision" about whether to continue infusions that helped with UC symptoms but caused such "debilitating" side effects. Id. Importantly, the testifying medical expert, Dr. Gaeta, on whom the ALJ relied as persuasive, admitted that he did not "specifically remember[] that particular statement." Tr. 315.

gain (Tr. 1020) and sometimes were efficacious for a time (Tr. 1019). Dr. Spellun noted in June

2020:

> Feeling better after infusion and IV steroids with it. . . . Now constipated . . . She
> is afraid of side effects and risk. Tumor, liver and lung. But oral low does should
> be low risk – and I am afraid of losing efficacy of TNF which is working for her
> and where do we go from there!! . . . <u>After infusion good for two weeks and
> starts to fail</u>. . . She is worse off the Firvanq – better on that too!

Tr. 1085 (emphasis supplied). In 2020, Plaintiff was also treated for "recurrent" urinary tract

infections and anemia by iron infusions. Tr. 1152, 1156, 1166, 1269. While in September 2020,

Dr. Spellun noted that Plaintiff was doing better and was "cooking all the time,"[10] Tr. 1260, by

the next appointment in November 2020, he noted that the improvement was due to prednisone

and he expressed concern about staying on steroids: "Better now on the prednisone . . . CT

showed colitis. Has been on every 4 weeks . . . . Off MTX, didn't tolerate it. . . . Discussed

Stelara, and if fails or stays on prednisone, <u>may need to consider surgery</u>." Tr. 1253 (emphasis

supplied). In November 2020, Plaintiff was briefly admitted to the hospital due to pain and

chronic diarrhea caused by what was confirmed by CT as "persistent colitis." Tr. 1207-11.

This limited record was reviewed by two non-examining physicians and two non-

examining psychologists. The psychologists opined to no severe impairments while the

physician both opined that Plaintiff could work at the light exertional level, limited *inter alia* by

the need unexpectedly to be off-task for toilet use five to eight minutes out of every hour. Tr.

359-73. None of the non-examining experts opined regarding absenteeism.

---

[10] The ALJ's decision cherry-picks this single reference to support the finding that "she had been cooking all the time." Tr. 19. What the record actually reflects is that Plaintiff had loved cooking before her illness had worsened and was largely unable to cook at all during the period in issue, Tr. 124, 666, 674, as well as that she suffered serious nutritional challenges caused by her need to limit what she eats to avoid exacerbating UC symptoms. <u>E.g.</u>, Tr. 2044 (home health nurse notes that Plaintiff was experiencing pain due to colitis and "isn't sure what to eat"). Dr. Spellun's treating notes do not reflect that this level of improved functioning existed prior to this appointment or that it continued after this appointment. Nor as far as the Court can ascertain does any other treating source during the relevant period mention such a level of functioning.

In 2021, the record reflects a significant worsening due to a UC flare.  Tr. 307, 1356.

Thus, in February 2021, Dr. Spellun noted that infusions of Remicade (the fourth medication he

had prescribed for UC) were effective, although Plaintiff continued to have side effects

impacting her hair and bones and continued to be diagnosed with anemia and chronic sinusitis;

Dr. Spellun advised Plaintiff to "do everything to stay off antibiotics."  Tr. 1516, 1518.  In late

February 2021 and again in May 2021, Plaintiff had serious adverse reactions to the Remicade

infusion.  Tr. 1315, 1323, 1382.  In early May, Plaintiff went to the emergency department for

constipation and abdominal distention/bloating; in mid-May, she was treated with IV fluids in

the emergency department for abdominal pain and diarrhea.  Tr. 1332, 1356-61.  Again, in mid-

May 2021, she was given IV fluids at a walk-in clinic.  Tr. 1652.  In June 2021, she was twice

given IV fluids in the emergency department; during the second instance, providers noted that

she needed to be started on a new UC medication but was too ill to initiate it.  Tr. 1421, 1530,

1532.  At the end of June 2021, she was given IV fluids at a walk-in clinic for severe

dehydration, Tr. 1652, and then was admitted to the hospital, tired, weak, confused, and suffering

from hyponatremia that again was addressed with IV fluids.  Tr. 1546-57.  In July 2021, she was

briefly admitted first at Rhode Island Hospital and then at Brigham and Women's Hospital,

presenting with diarrhea and needing IV fluids.  Tr. 1581-1614.  In September 2021, Plaintiff

began treating with Dr. Nancy Lasson for primary care and Dr. Colleen Kelly for

gastroenterology.  After the first appointment and a file review, Dr. Kelly noted diagnoses of

"ulcerative pancolitis with complication" and anemia, "[c]ouple of recent hospitalization,"

"reactions to some of her Remicade infusions," C Diff., bronchitis with antibiotics, "worsening

diarrhea" but also constipation and "joint and back pain/stiffness."  Tr. 1763-66, 2510.  While

observing on colonoscopy that the disease activity was "fairly mild," Dr. Kelly expressed

significant concern, particularly due to "symptom of constipation/straining." Tr. 1771. She advised Plaintiff to hold off on another switch of medication until further study, id.; by November 2021, Dr. Kelly noted that, due to UC symptoms, Plaintiff was unable to taper down from prednisone despite its side effects, as well as that Plaintiff's UC flares seemed linked to seasonal changes. Tr. 1842, 2510.

In early 2022, Plaintiff's health catastrophically changed when she contracted COVID-19, which resulted in a lengthy hospitalization followed by extended in-home care including oxygen and therapy to treat serious deconditioning. Tr. 1865-2255. During the hospitalization, the record reflects treatment difficulties posed by past and ongoing steroid use for UC; diarrhea, constipation and dehydration are mentioned as matters of concern. Tr. 1870, 1946, 1953-54. Once Plaintiff was discharged, she was homebound for months, seemingly through the date of the ALJ's decision.[11] See Tr. 1985-2089, 2163-2255. The home health nurses who visited her almost daily focused not just on the challenges caused by the COVID-19 illness, but also on Plaintiff's UC symptoms, including diarrhea, dehydration, constipation, abdominal pain, difficulties with eating and the resulting adverse impact on nutrition, the need to have a commode right next to her bed, and the impact of "prescribed medications for gastrointestinal side effects." Tr. 1989-90, 1998, 2044, 2008, 2045. There is a paucity of other 2022 records in the pre-ALJ-decision materials, although there is one note recorded shortly after discharge by Dr. Lasson: "Since being home she is very gassy and bloated. Seems to be gassy from anything she eats. She will put a call out to her GI physician . . . ." Tr. 2587.

---

[11] Because the home health records (which reflect the ongoing need for homebound-based visits) were produced only through March 24, 2022, it impossible to ascertain whether Plaintiff was still homebound as of May 5, 2022, although Plaintiff was still using oxygen at home at the time of the telephonic ALJ hearing. Tr. 299. Because her severe COVID-19 respiratory illness had not yet persisted for twelve months and, as of the date of the ALJ's decision, it was unknown whether it would, Plaintiff's 2022 respiratory-related symptoms are not in issue in this case. See Tr. 307-08 (as Dr. Gaeta testified, "COVID and pneumonia and pulmonary emboli, . . . that's a recent issue and, you know, we don't know what that's going to be in a year").

Significant post-hospitalization 2022 treating records were provided to the Appeals Council after the ALJ's decision. Tr. 44-289. Most of these records clearly pertain to the relevant 2022 period prior to the ALJ's decision. Tr. 52-53, 63-249, 269-89. In these records, numerous treating physicians noted the ongoing severity of Plaintiff's UC symptoms during this latter part of the period in issue. For example, in March 2022, Dr. Lasson recorded that Plaintiff was gaining weight despite eating only one meal a day and that she gets "significantly uncomfortable" abdominal bloating if she eats too much. Tr. 133-35 ("Steroids can raise BP and cause wt gain"). In April 2022, Dr. Lasson noted Plaintiff's report that she was so "inflamed [she] can't bend over, bend my fingers well or walk up stairs" and that, "[b]ecause she cannot have a colonoscopy [due to medication to treat COVID-19 symptoms] she remains on steroids," which Dr. Lasson linked to her symptoms including pain and difficulty moving. Tr. 157. As Dr. Lasson summarized, "she is very symptomatic from her UC and has chronic diarrhea with occasional constipation." Tr. 183. Also in April 2022, Dr. Jon Lambrecht, a treating cardiologist, noted her slow and difficult recovery and opined that she had "a difficult time with her colitis," as well as that "[h]er course is also complicated by her ulcerative colitis." Tr. 272, 283. And in late May 2022 (at an appointment on May 31, less than two weeks after the ALJ's decision), Dr. Abhinav Misra, a treating pulmonologist, noted: "[h]er Ulcerative Colitis is very symptomatic . . . Has significant bloating with any meals. Going to try solera for UC, currently on prednisone. . . For UC has been on xelganz, mesalamine, humira, entivio . . . Automimmune Features: Known diagnosis of UC based on a biopsy. Joint pain in her fingers and toes, sinusitis, some ulcers on her skin." Tr. 258. None of these 2022 records were seen by Dr. Joseph Gaeta, the testifying medical expert on whom the ALJ significantly relied.

Both of Plaintiff's treating gastroenterologists (Drs. Spellun and Kelly) and her treating primary care physician (Dr. Lasson) specifically opined that Plaintiff is not a malingerer.  Tr. 1092, 1835, 2579.  No source has opined to the contrary.  In late 2020, Dr. Spellun noted that Plaintiff's UC may need surgical intervention if the latest UC treatment failed; similarly, on May 4, 2022, days before the close of the relevant period, the other gastroenterologist, Dr. Kelly, noted that a "possible clinical trial or colectomy" might be recommended.[12]  Tr. 53, 1253.  Both gastroenterologists also opined (Dr. Spellun in August 2020 and Dr. Kelly in January 2022) that Plaintiff would need frequent unscheduled breaks during the workday to use the toilet,[13] that she would be late for work or leave early more than four days per month and that she would be absent due to a sick day more than four days a month.  Tr. 1092-93, 1835-36.  Dr. Lasson concurred, opining in April 2022 that Plaintiff would suffer symptoms (pain, fatigue, effects of medication or otherwise) severe enough to cause more than four days of absenteeism per month.  Tr. 2578-80.

On March 17, 2021, the ALJ issued an initial decision, in which she found that IBD and anemia are severe impairments, but that Plaintiff retains the ability ("RFC")[14] to perform light work with no limits based either on being off-task due to toilet issues or absent due to the need to leave work for UC infusions or due to hospitalization, sickness, pain and fatigue.  Tr. 380.  The Appeals Council remanded for a do-over, based *inter alia*, on the ALJ's disregard of the non-

---

[12] While Dr. Kelly's treating record for May 4, 2022, is not in the medical record, it is referenced in Dr. Lasson's progress notes as part of the electronic record at Lifespan where both of them practiced.  Tr. 52-53.

[13] Dr. Spellun opined that Plaintiff would "always" need unscheduled restroom breaks with almost no notice.  Tr. 1092.  Dr. Kelly was more specific, opining that Plaintiff would need to take five to six unscheduled restroom breaks during the workday, each of ten to fifteen minutes duration, with no advance notice.  Tr. 1835.

[14] RFC refers to "residual functional capacity."  It is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

examining physicians' findings of limits due to the need for a sit-stand option to relieve pain and discomfort and the need to be off-task for bathroom use for five to eight minutes an hour.  Tr. 392-93.  The same ALJ convened a second hearing at which a medical expert (Dr. Gaeta who is an internist and cardiologist)[15] testified.  Although Dr. Gaeta conceded that Plaintiff's UC and her ongoing need for infusions to treat UC would be expected to cause fatigue and arthralgias, that Plaintiff was frequently sick, and that Plaintiff had been worse for a while in 2021 because of a UC flare, Dr. Gaeta testified that Plaintiff has been "on the whole pretty stable during this period" and "doing pretty well right now."  Tr. 305-08.  He opined to a light RFC with no limits based on off-task time to use the bathroom or for infusions; his opinion ignores the issue of absenteeism.  The ALJ also called a vocational expert ("VE"), who testified that "off-task 15% or more" is work preclusive, as well as that "one or more days consecutively per month" of absenteeism would not be tolerated in the workplace.  Tr. 356.

Relying on Dr. Gaeta and the non-examining physicians (whose toilet-use limit she adopted), the ALJ's second decision found only IBD to be severe and concluded that Plaintiff remained able to perform light work, with postural and climbing limits and the need to be off-task for toilet use up to 13%[16] of the workday.  While the ALJ accepted that Plaintiff's need for infusions every four weeks (an in-office medical procedure that takes up to two hours and sometimes produces side effects), she did not ask the VE to factor the impact of such an interruption into his opinion regarding available work, relying instead on her own lay analysis to

---

[15] As confirmed during the hearing, Dr. Gaeta does not specialize in gastroenterology.  See Tr. 312.

[16] The ALJ's decision relies on the unplanned need to be off-task for toilet use up to five to eight minutes per hour.  Tr. 16.  Plaintiff's attorney performed the calculation to translate this limit into a percentage of the workday, which allows a comparison of the ALJ's off-task limit to the VE's testimony regarding what is tolerable in the jobs to which he opined (which he expressed as a percentage of the working day).  See Tr. 782 (ALJ's bathroom limit of five to eight minutes per hour translates to being off-task 13.33% of every workday); ECF No. 12-1 at 41 (ALJ's bathroom limit of five-to-eight minutes per hour translates to being off-task up to 13% of each hour of the workday).  The Commissioner has not disputed this calculation.

find that the "infusions occurred monthly, and were planned medical events, and as such, she could schedule them around a work schedule and they should not result in absenteeism." Tr. 17. Based on this finding, the ALJ assigned no limits at all due to absenteeism. To reach these findings, the ALJ did not credit Plaintiff's subjective statements (or the observations of Plaintiff's daughter) regarding her UC symptoms, including not just bathroom use, but also illness, pain and fatigue, and rejected as not persuasive the RFC opinions of both of Plaintiff's treating gastroenterologists (Drs. Spellun and Kelly) and of her primary care physician (Dr. Lasson). Based on the VE's testimony regarding jobs that tolerate up to 13% of the workday unexpectedly off-task, the ALJ found that Plaintiff is not disabled because she could perform work that is sufficiently available in the national economy. Tr. 16-28. Despite its receipt of the substantial tranche of new records pertaining to the period in issue discussed *supra*, the Appeals Council denied review based on its finding that these do not "show a reasonable probability that [this evidence] would change the outcome." Tr. 1-2.

Regarding off-task time and alluding to the VE's testimony that "off-task 15% or more" is work preclusive, Tr. 356, the ALJ's decision acknowledges that she found Plaintiff to be on the cusp of being disabled, in that unexpected toilet use of just one minute more ("9 or minutes per hour") than the five-to-eight-minutes per hour limit in her RFC would compel a finding of disability. Tr. 28. Thus, it is undisputed that Dr. Kelly's off-task-time opinion – off-task time for unexpected toilet use up to 18.75% of the workday – would eliminate all work, Tr. 1835, while Dr. Spellun's opinion regarding off-task time for toilet use is even more extreme. Tr. 1092.

## II.    **Standard of Review**

As long as the correct legal standard is applied, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g), 1383(c)(3); see Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 587 U.S. 97, 103 (2019). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Though the difference is quite subtle, this standard is "somewhat less strict" than the "clearly erroneous" standard that appellate courts use to review district court fact-finding. Dickinson v. Zurko, 527 U.S. 150, 153, 162-63 (1999) (cited with approval in Biestek, 587 U.S. at 103). Thus, substantial evidence is more than a scintilla – it must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987); Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 195 (1st Cir. 1987); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999); see Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (per curiam) (court must consider evidence detracting from evidence on which Commissioner relied). The Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The

Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner.  Thomas P. v. Kijakazi, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), adopted by text order (D.R.I. Mar. 31, 2022).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the law was incorrectly applied, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g).  Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir.1996)).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits.  Sacilowski, 959 F.3d at 433, 440-41; Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001); Randy M. v. Kijakazi, C.A. No. 20-329JJM, 2021 WL 4551141, at *2 (D.R.I. Oct. 5, 2021), adopted (D.R.I. Oct. 28, 2021).

## III.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.605.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.905-911.

### A.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920(a)(1).  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  Id. § 416.920(a)(1)(4)(i).  Second, if a claimant does not have any impairment or

12

combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 416.920(a)(1)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 416.920(a)(1)(4)(iii).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 416.920(a)(1)(4)(iv).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 416.920(a)(1)(4)(v).  The claimant bears the burden of proof at Steps One through Four, but it shifts to the Commissioner at Step Five.  Sacilowski, 959 F.3d at 433-34.

## B.    Opinion Evidence

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 416.920c.  The most important factors to be considered when the Commissioner evaluates the persuasiveness of a medical opinion are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  20 C.F.R. § 416.920c(b)(2); Elizabeth V. v. O'Malley, C.A. No. 23-00459-WES, 2024 WL 1460354, at *3 (D.R.I. Apr. 4, 2024), adopted by text order (D.R.I. Apr. 19, 2024).  Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding[] is with other evidence in the claim." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017).  Other factors that are weighed in light of all of the evidence in the record include the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R.

§ 416.920c(c)(1)-(5); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed.

Reg. at 5859.  "A medical opinion without supporting evidence, or one that is inconsistent with

evidence from other sources, [is] not . . . persuasive regardless of who made the medical

opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at

5854.  If the ALJ has equally persuasive medical opinions or administrative findings about the

same issue that are both supported and consistent but not the same, he is required to articulate the

other factors that he relied on to resolve the conflict.  20 C.F.R. § 416.920c(b)(3).

    **C.**    **Pain**

"Pain can constitute a significant non-exertional impairment."  Nguyen v. Chater, 172

F.3d 31, 36 (1st Cir. 1999).  Congress has determined that a claimant will not be considered

disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is

furnished showing the existence of a medical impairment which could reasonably be expected to

produce the pain or symptoms alleged.  42 U.S.C. §§ 423(d)(5)(A); 1382c(a)(3)(H).  To comply

with this requirement, an ALJ must consider a claimant's statements about pain and determine

the extent to which they are reasonably consistent with the objective medical evidence but also

may not disregard them "solely because the objective medical evidence does not substantiate the

degree of impairment-related symptoms."  SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017);

20 C.F.R. § 416.929(c)(3).

Although the law is clear that an individual's statements as to pain alone are not

conclusive of disability, 42 U.S.C. § 423(d)(5)(A), remand is required if the ALJ fails properly to

perform the pain analysis as long as the claimant has sustained her burden of presenting a

competent treating source opinion endorsing both the diagnosis of an impairment that causes

subjective pain, as well as evidence of function-limiting pain.  Tegan S. v. Saul, 546 F. Supp. 3d

162, 171 (D.R.I. 2021).  That is, hearing officers are "not free to discount pain complaints simply because the alleged severity thereof is not corroborated by objective medical findings."  Carbone v. Sullivan, No. 91-1964, 960 F.2d 143 (Table Dec.), 1992 WL 75143, at *5 (1st Cir. Apr. 14, 1992) (per curiam); see Carlos N. v. Kijakazi, C.A. No. 20-398-MSM-PAS, 2021 WL 5231949, at *8-9 (D.R.I. Nov. 10, 2021), adopted, 2022 WL 103322 (D.R.I. Jan. 11, 2022).  An ALJ's "extreme insistence on objective medical findings to corroborate subjective testimony of limitations of function because of pain is error."  Dianne D. v. Berryhill, C.A. No. 18-312JJM, 2019 WL 2521840, at *7 (D.R.I. June 19, 2019) (quoting Avery v. Sec'y of Health & Hum. Servs., 797 F. 2d 19, 22 (1st Cir. 1986)), adopted by text order (D.R.I. July 5, 2019).

### D.    Assessment of Claimant's Subjective Statements

In addition to statements regarding pain, the ALJ must consider the claimant's other subjective statements regarding the limitations caused by symptoms.  Where an ALJ decides not to fully credit such subjective statements, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.  However, in the absence of evidence that directly rebuts the claimant's testimony or presents some other reason to question its credibility, the ALJ must take the claimant's statements as true.  Sacilowski, 959 F.3d at 441.

### E.    Absenteeism

When the symptoms of an impairment or combination of impairments would cause the claimant periodically to be unable to attend work, it is reversible error if the ALJ fails specifically to assess the issue of absenteeism.  Jacquelyn V. v. Kijakazi, No. CV 21-314MSM,

2023 WL 371976, at *5 (D.R.I. Jan. 24, 2023), adopted by text order (D.R.I. Mar. 7, 2023).

Remand is similarly required if the ALJ relies on the findings of non-examining physician

experts who did not address absenteeism because, for example, they did not see records

establishing the sheer scope of claimant's many medical concerns.  Jessica S. v. Kijakazi, C.A.

No. 21-75MSM, 2022 WL 522561, at *4-6 (D.R.I. Feb. 22, 2022) (non-examining experts "did

not have access to a sufficiently developed record to permit them even to consider how the total

number of medical appointments and hospitalizations would impact work attendance"), adopted,

2022 WL 834019 (D.R.I. Mar. 21, 2022).  That is, it is error for an ALJ to ignore the impact on

the ability to work of multiple impairments each of which could impact attendance, particularly

where it is "undisputed that [the claimant's medical] issues required ongoing treatment

throughout [an extended period]."  Sacilowski, 959 F.3d at 435-36; see 20 C.F.R. § 404.1523(b)

(requirement for treatment of combined effect of multiple impairments).  And when a treating

source's longtime familiarity with a claimant and her ailments confirms that the absenteeism

caused by the impairments is work-preclusive, reinforcing the already overwhelming evidence of

disability, remand for an award of benefits may be appropriate, despite the claimant's capacity to

engage in certain daily home activities.  See id. at 440-41.

### F.    Appeals Council's Consideration of Newly Submitted Evidence

The Appeals Council must review a case if it receives "additional evidence that is new,

material, and relates to the period on or before the date of the hearing decision, and there is a

reasonable probability that the additional evidence would change the outcome of the decision."

20 C.F.R. § 416.1470(a)(5); see Catherine I. v. Saul, C.A. No. 19-394WES, 2020 WL 2730907,

at *10 (D.R.I. May 26, 2020), adopted by text order (D.R.I. June 18, 2020).  When the Appeals

Council denies review, the already deferential substantial-evidence standard of review is

supplanted by the exceedingly narrow egregious error standard.  Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001); Suliman v. Saul, CIVIL ACTION NO. 1:20-CV-11985-RWZ, 2022 WL 3108850, at *3 (D. Mass. Aug. 3, 2022).  The Appeals Council's denial of review is afforded "a great deal of latitude" and "great deference."  Mills, 244 F.3d at 5-6.  In this context, egregious has been interpreted to mean "'[e]xtremely or remarkably bad; flagrant.'"  Ortiz Rosado v. Barnhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004) (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)) (alteration in original).  Nevertheless, review is appropriate where the mistake is "explicit" or represents an "egregious error."  Mills, 244 F.3d at 5.  For example, when a physician's record contains material information that plainly relates back to the period on or before the ALJ's decision, it would be egregious error to refuse to review the case based only on the finding that the new evidence "does not relate to the period at issue" simply because the record is dated shortly after the decision issued.  Cabral v. Kijakazi, Civil Action No. 21-10049-PBS, 2022 WL 1211335, at *1 (D. Mass. Apr. 25, 2022).

**IV.**     <u>**Analysis**</u>

   **A.     ALJ's RFC Errors**

   The backdrop for this appeal is the ALJ's undisputed finding that Plaintiff's UC symptoms have left her limited to work at which she could be off-task up to 13% of the workday to make unscheduled use of the toilet.  Mindful that this finding puts Plaintiff on the cusp of an off-task-time limitation (15% of the workday) that would preclude all work, and that the ALJ's duty is to construe the evidence consistent with the beneficent purpose of the statute, Smith v. Berryhill, 139 S. Ct. 1765, 1776 (2019), Plaintiff has asked the Court to focus on the overwhelming and undisputed evidence of absenteeism in both the medical record and the three treating source opinions, all of which was largely ignored by the ALJ and totally ignored by the

SSA expert medical sources on whom she relied.  Plaintiff contends that the ALJ's RFC lacks

the support of substantial evidence not only because she erroneously relied only on the flawed

findings/opinion of the non-examining physicians and Dr. Gaeta, while rejecting the well-

supported and consistent-with-the-record treating source opinions regarding off-task time, but

also more fundamentally because the RFC entirely omits any limitations based on absenteeism.

I begin by examining the appropriateness of the ALJ's reliance on the findings of the

non-examining expert physicians, who opined to off-task time, but ignored the issue of

absenteeism, and on the opinion of the testifying medical expert, Dr. Gaeta, who testified that

Plaintiff was "pretty stable" with no need for off-task time and totally ignored the issue of

absenteeism.  Tr. 306.  Apart from the many other problems with both Dr. Gaeta's testimony,[17]

---

[17] For example, in his opening answer to the ALJ's first substantive question, Dr. Gaeta identified UC as a diagnosed impairment, but also testified that he limited his analysis of the level of impairment to a search for specific medical evidence of "frequency" of diarrhea coupled with severe abdominal pain, which he claimed not to find, instead noting that treatment by steroids caused constipation, which he seemed to consider benign.  Tr. 304-06.  It was the ALJ who had to point out to Dr. Gaeta that the record he claimed to have read included evidence of a serious UC flare in 2021.  Tr. 307.  Further, ignoring Dr. Lasson's opinion that weight gain is a steroid side effect, Tr. 2578; see Tr. 133, 135, Dr. Gaeta testified that the absence of weight loss was further evidence that "at the whole," the disease was "pretty stable . . . during this . . . time period."  Tr. 305-06.  When questioned on cross examination regarding the symptoms of UC, Dr. Gaeta conceded that they include not just diarrhea but also the need to spend time in the toilet due to the explosive urge to go but no bowel movement.  Tr. 310-11.  Also, during cross examination, Dr. Gaeta sidestepped, testifying that "I'm not a gastroenterologist," admitting that his testimony was limited by what he saw in the record, and conceding that one cannot assume that a gastroenterologist (which he is not) with a longstanding treating relationship would record frequency of bathroom use.  Tr. 311-12.  Notable is this exchange between Dr. Gaeta and Plaintiff's attorney:

Q: Right.  So you can't assume that she's not going to the bathroom, right?

A: Yes.

Tr. 312.  Also notable is that Dr. Gaeta (a cardiologist) did not comment, one way or the other, on the consistency and supportability in relation to the treating medical record of the opinions of the specialists (both gastroenterologists) who (unlike him) do have the requisite expertise.  That is, although the opinions of both gastroenterologists (Drs. Spellun and Kelly) were in the record Dr. Gaeta reviewed and both opined that Plaintiff's symptoms would result in work-preclusive off-task time in the toilet, as well as work-preclusive absenteeism, Dr. Gaeta ignored their opinions and did not to explain how they gibe with his very different conclusions from his review of their treating records.

and the ALJ's reliance on Dr. Gaeta,[18] two matters that taint the ALJ's reliance on any of these SSA experts stand out.

First, like the medical expert in Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018), Dr. Gaeta opined in reliance on a materially incomplete record in that he did not see the substantial tranche of 2022 treating records for the period in issue; these establish that, far from being stable and doing well, as Dr. Gaeta testified, Plaintiff was "very symptomatic from her UC and has chronic diarrhea with occasional constipation," and was having "a difficult time with her colitis." Tr. 272, 283; see Virgen C., 2018 WL 4693954, at *3 (error for ALJ to deny benefits in reliance on testifying medical expert who was not privy to parts of medical record that clearly support claimed limitation). Even worse, the non-examining experts saw nothing after October 2020; thus, their opinions were formed without access to any of the 2021/2022 records, when Plaintiff's UC symptoms materially worsened after serious side effects and the decline in efficaciousness or other illness caused her repeatedly to stop treatment by infusion. For this reason alone, none of these findings/opinions amounts to substantial evidence and the ALJ's reliance on them is error that requires remand.

Second, like the state agency experts in Sacilowski, 959 F.3d at 441, neither the non-examining physicians nor Dr. Gaeta offered any opinion, one way or the other, regarding absenteeism. As in Sacilowski, the ALJ here was faced with a record replete with substantial evidence that Plaintiff would be limited by work-preclusive absenteeism. This evidence includes not just the treating record and Plaintiff's statements, as well as those of her daughter, but also

---

[18] For example, the ALJ took Dr. Gaeta's testimony that Plaintiff did not have "frequent flareups where . . . she had to be hospitalized," Tr. 307, and expanded it to support the finding that "there is no evidence that she had to be hospitalized for flares since November 2019." Tr. 23. The ALJ's conclusion is simply wrong. Plaintiff was admitted to various hospitals (albeit briefly) due to UC symptoms several times since November 2019, primarily during the months in 2021 when she was experiencing a protracted flare. E.g., Tr. 1546, 1581, 1606.

the opinions of virtually all[19] of Plaintiff's longitudinal treating sources – her primary care physician and both of her treating gastroenterologists.  With no absenteeism opinion from either the non-examining experts or Dr. Gaeta, the ALJ was left with no competent evidence to contradict the treating source opinions.  Instead of accepting their opinions, the ALJ rejected them (erroneously, see *infra*) and made an absenteeism finding improperly based on her lay experience, beginning with the illogical premise that only the need for infusions should be considered (ignoring that absenteeism would be caused not just by infusions but also *inter alia* by Plaintiff's pain, fatigue, many infectious illnesses, medication side effects and recurring need for hospital/clinic administration of IV fluids, as Drs. Spellun, Kelly and Lasson all opined), resulting in the illogical conclusion that, because Plaintiff could schedule a half day out during the workday every month for an infusion in advance, this time out of the working day "should not result in absenteeism."  Tr. 17; see Jessica S., 2022 WL 522561, at *5 (ALJ erred in tackling impact of open G-tube on ability to work with no medical findings or opinions to guide him by making lay finding that G-tube interventions could be scheduled after hours).

The ALJ's reasons for discounting as unpersuasive the three treating sources opinions on absenteeism are equally unsupported.  For starters, the ALJ's rejection of these opinions because all three filled in a "checkbox format" form makes no sense in that such forms are ubiquitous in Social Security cases and, in this case, all three plainly provided adequately detailed information.  Also unsupported is the ALJ's finding that the gastroenterologists' absenteeism opinions were "speculative" despite the overwhelming evidence in their treating records of sufficiently severe

---

[19] While Plaintiff saw many treating providers, including many specialists, it was her primary care provider (Dr. Lasson) and her gastroenterologists (Drs. Spellun and Kelly) who saw her the most.  It is notable that all three of them opined to the same severe level of absenteeism.  See Ogannes B. v. Kijakazi, C.A. No. 22-325WES, 2023 WL 5561108, at *12 (D.R.I. Aug. 29, 2023) (appropriate for court to consider that all sources who had contact with claimant opined to disabling symptoms), adopted by text order (D.R.I. Sept. 13, 2023).

symptoms to adversely impact work attendance.  Similarly, the ALJ's decision to discount Dr. Lasson's absenteeism opinion because it was "largely focused on the claimant's more recent COVID-19 infection" ignores that Dr. Lasson clearly explained that her opinions covered not just the COVID-19 period, but also the period prior to COVID-19, and that they are based principally on the symptoms of "wt gain, bloating, . . . diarrhea, occ constipation, anxiety," "chronic abd pain," and steroid side effects, which all relate to UC.  Tr. 2578.  And the ALJ's rejection of Plaintiff's subjective descriptions (and the description from Plaintiff's daughter) of the severity of her symptoms cannot stand in light of the lack of concrete evidence that contradicts them.  See Sacilowski, 959 F.3d at 441.

### B.     Appeals Council's Egregious Error

As recited above, the evidence submitted to the Appeals Council confirms several of the ALJ's errors.  Thus, these materials make plain that the ALJ erred in relying on the flawed opinions/findings of Dr. Gaeta and the non-examining experts.  They also clearly expose that the ALJ's approach to absenteeism was tainted by error.  The problem is illustrated by Dr. Lasson's 2022 treating notes, which describe debilitating pain, chronic diarrhea, constipation/bloating, feeling sick and bleeding from medication to treat cryptosporidium (the latest in Plaintiff's pattern of infectious illnesses).  It was error for the Appeals Council to have rejected all of this evidence that clearly bears on the period in issue and plainly shows far more than a reasonable probability that it would change the outcome of the decision.  In the circumstance of this case, I find the error to be egregious.

### C.     Remand for Award of Benefits

The errors identified in the preceding analysis are material and require remand.  The issue for the Court is whether that remand should be for further proceedings or for an award of

benefits.  See Ogannes B. v. Kijakazi, C.A. No. 22-325WES, 2023 WL 5561108, at *12 (D.R.I.

Aug. 29, 2023) (citing Sacilowski, 959 F.3d at 439-41), adopted by text order (D.R.I. Sept. 13,

2023).  In considering this question, the Court recognizes that the off-task limitation arising from

Plaintiff's need unexpectedly to use a toilet has already been set by the ALJ at 13% of the

workday.  Thus, the focus now must be on the incremental additional time off-task or away from

work, mindful that the VE testified that "off-task 15% or more" and "one or more days

consecutively per month" are both work preclusive.  Tr. 356.  Here, the Court need only examine

the undisputed evidence of absenteeism that would objectively be caused by Plaintiff's UC

symptoms, which includes at least a half day a month away from work during the normal

workday for UC infusions, periodic days away from work to go to a hospital or clinic for IV

fluids, and periodic unplanned absences causes by infectious illness, pain, fatigue and other

symptoms.  With this evidence as backdrop to render their opinions both consistent and

supported, the Court finds determinative the unrebutted opinions of the three treating physicians

establishing an absenteeism rate of more than four days a month.  Guided by Sacilowski, the

Court finds that this is one of the unusual cases where remand for an award of benefits is

appropriate.  See Jacquelyn V., 2023 WL 371976, at *12 (in light of "overwhelming and

undisputed evidence of pain and fatigue, and the evidence of its impact as reflected in [treating

source] opinion, as well as . . . the vocational expert's testimony that more than one day a month

of absence is work-preclusive," remand for award of benefits is appropriate).

V.    **Conclusion**

Based on the foregoing, Plaintiff's Motion for Reversal of the Disability Determination

of the Commissioner (ECF No. 12) is GRANTED and the Commissioner's Motion to Affirm

(ECF No. 15) is DENIED.  It is hereby adjudged that the Court remands this case to the

Commissioner under sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. §

405(g) and directs that this matter is allowed finding the claimant disabled and awarded benefits.


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 8, 2024